IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-13-844-1 |
| | § | (CV. No. 2:16-229) |
| RICARDO GUERRERO, | § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE, AND DENYING
CERTIFICATE OF APPEALABILITY**

Ricardo Guerrero was convicted in 2014 of engaging in a drug trafficking conspiracy, conspiracy to commit money laundering, and being a felon in possession of firearms. He was sentenced to life imprisonment as a result of the enhanced penalty provisions of 21 U.S.C. §§ 841(b) and 851. Guerrero challenges his sentence by motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. D.E. 925. The Court denies Guerrero's § 2255 claims and denies him a certificate of appealability.

## I. BACKGROUND

Guerrero was convicted after a jury trial. The government's evidence at trial consisted of numerous intercepted telephone calls to and from Guerrero, field surveillance, drug seizures, testimony of co-conspirators, testimony of law enforcement officers and agents involved in the investigation, and chemists. The evidence established that Guerrero imported methamphetamine and cocaine from Mexico, and dealt in heroin, methamphetamine, and cocaine in Texas and beyond. He concealed his profits by buying

and selling used cars, cattle, roosters, and horses. He also rented out several properties. Many of the transactions were made in cash and in someone else's name.

Guerrero was indicted along with 22 others in September 2013. D.E. 1. He was charged with conspiracy to possess with intent to distribute more than 1 kilogram of heroin, more than 500 grams of methamphetamine, and more than five kilograms of cocaine in Count One. He and others were also charged with conspiracy to commit money laundering. The Indictment also sought forfeiture of property. *Id.* A Superseding Indictment added Count Five, a felon in possession count against Guerrero. The drug trafficking and money laundering conspiracy charges against him were re-numbered as Counts One and Two.

The government filed an Information to Establish Prior Conviction in December 2013. D.E. 326. The Information identified two previous felony drug convictions pursuant to 21 U.S.C. § 851.

One of the drug seizures resulted from a traffic stop of a vehicle in which Guerrero was a passenger. An officer searched Guerrero and found black tar heroin in his pockets. Before trial, Guerrero challenged the stop and moved to suppress the heroin. D.E. 448. This Court denied the motion after an evidentiary hearing.

All of Guerrero's co-defendants pleaded guilty. Several of them testified against him. The jury found Guerrero guilty on all counts and found three real properties to be subject to forfeiture. D.E. 499, 503.

The Probation Department prepared a Presentence Investigation Report (PSR). D.E. 607. Guerrero was held accountable for 8.76 kilograms of heroin, 21 kilograms of

cocaine, 2.37 kilograms of methamphetamine, and 3.43 kilograms (actual) methamphetamine. Guerrero's base offense level was 38 based on drug quantity. His offense level was increased on multiple grounds: 1) firearms found in proximity to seized drugs, 2) the methamphetamine was imported, 3) leadership role, 4) use of a minor, and 5) obstruction of justice. Guerrero's total offense level on the drug charge was 50. His offense level for the firearms charge was 26.

Guerrero's prior drug convictions did not increase his total offense level, but qualified him as a career offender. Guerrero's career offender status increased his criminal history level from IV to VI. *Id.*, ¶ 96. Guerrero's guideline sentencing range as a career offender was life imprisonment on the drug trafficking conspiracy. *Id.*, ¶ 127. With the § 851 enhancement, Guerrero faced a mandatory life sentence on the drug trafficking count.[1] The statutory maximum sentence for money laundering is 20 years, and for felon in possession is 10 years. *Id.*, ¶¶ 125-26.

Sentencing was held on June 5, 2014. The Court sentenced Guerrero to mandatory life imprisonment for drug trafficking conspiracy, twenty years imprisonment for money laundering conspiracy, and ten years imprisonment as a felon in possession. D.E. 652.

On appeal, Guerrero challenged the denial of his motion to suppress and the constitutionality of his enhancement to mandatory life. The Fifth Circuit Court of Appeals affirmed. *United States v. Guerrero*, 603 Fed. App'x 328 (5th Cir. May 14,

---

[1] *See* 21 U.S.C. § 841(b)(1)(A) ("any person [who] commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense ... shall be sentenced to a mandatory term of life imprisonment without release.").

2015) (per curiam) (unpublished). Guerrero's application for writ of certiorari was denied. D.E. 882. His present motion is timely.

## II.  MOVANT'S ALLEGATIONS

Guerrero raises multiple issues that fall into the following categories: 1) trial counsel was ineffective on multiple grounds; 2) trial counsel had a conflict of interest; and 3) appellate counsel provided ineffective assistance.

The government argues that Guerrero's claims are without merit.

## III.  ANALYSIS

### A.  28 U.S.C. § 2255

There are four cognizable grounds upon which a federal prisoner may move to vacate, set aside or correct his sentence: 1) constitutional issues, 2) challenges to the district court's jurisdiction to impose the sentence, 3) challenges to the length of a sentence in excess of the statutory maximum, and 4) claims that the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam).

### B.  Conflict of Interest

Guerrero alleges that his counsel had a conflict of interest because he claims his counsel also represented Jada Gregg Warren, a co-defendant, in October and November 2013.

"[T]o establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[P]rejudice is presumed if the defendant shows that an actual conflict of interest adversely affected his lawyer's performance." *Bartee v. Quarterman*, 339 Fed. App'x 429, 437 (5th Cir. July 31, 2009) (quoting *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc)).

The Court appointed John Gilmore to represent Guerrero on September 26, 2013, the day Guerrero first appeared in court. D.E. 35. Gilmore represented Guerrero at arraignment and through the trial and sentencing on June 10, 2014.

The Court appointed James Dewey Granberry to represent Warren on October 4, 2013. D.E. 170. Granberry appeared with Warren at arraignment on October 8, 2013. On October 28, 2013, Granberry filed a motion to continue Warren's trial date. D.E. 255. The Court granted the motion during the final pretrial conference on November 4, 2013, even though Granberry was absent from that hearing due to a personal emergency. D.E. 284. Granberry represented Warren at her next hearing on January 31, 2014, when Warren pleaded guilty. See D.E. 408, 411, 412. He appeared with her for sentencing as well. *See* Minute Entry Sentencing for Warren on June 5, 2014.

Gilmore appeared for Guerrero at the pretrial conference on November 4, 2013, and he requested a 90 day continuance of Guerrero's trial date for. *Id*., p. 13. A number of other defendants requested the same delay. Warren and several other defendants did not have lawyers present on November 4, 2013. *See* D.E. 697, pp. 2-4. When the Court turned to Warren's case, the proceedings in pertinent part were as follows:

14 THE COURT: Jada Warren?
15 MR. GILMORE: Your Honor, that's Mr. Granberry's
16 case. He's in North Carolina right now.
17 THE COURT: Right. Do you have any announcements on
18 that case?
19 MR. GILMORE: I think he's asking for a brief
20 continuance, Judge.
21 THE COURT: Did you talk to him before he left?
22 MR. GILMORE: I did, Judge.
23 THE COURT: He would be content with 90 days?
24 MR. GILMORE: Yes, your Honor.
25 THE COURT: Where is Jada Warren? . . .
10 THE COURT: Okay. I'm going to continue her case for
11 90 days. . . .
19 THE COURT: You may have to sign some releases.
20 Mr. Gilmore can help you with signing those releases. He knows
21 Mr. Granberry. Mr. Granberry has a personal matter today and
22 that's why I asked Mr. Granberry to send Mr. Gilmore.
23 So that's where we are.
24 *He's not your lawyer* --
25 DEFENDANT WARREN: *I know*. . . .
4 THE COURT: . . . So here's what we're
5 doing: Your case is going to be set 90 days.

*Id*., pp. 17-22 (emphasis added).[2]

Magistrate Judge Ellington held a nine minute hearing on Warren's medical situation later the same day. Warren was present. Gilmore attended.

Warren was a witness at trial against Guerrero. She testified that her husband, Sandro Rodriguez, delivered drugs and collected payments for Guerrero. After Rodriguez was arrested, Guerrero made Warren sell black tar heroin for him. She sold heroin for some months before she and Guerrero had a falling out. Warren believed that Guerrero gave permission to others to kill her. Soon after, Warren went to law enforcement and began cooperating.

---

[2] Warren was obviously ill. The omitted portions were a conversation between the Court,

Gilmore cross-examined Warren regarding her criminal history, her drug use, former drug dealing, as well as her recorded conversations with Guerrero. During closing, Gilmore highlighted problems with Warren's testimony:

> 19 Jada Gregg Warren, she is an admitted cocaine abuser.
> 20 The Judge tells you in the charge about testimony from people
> 21 who are addicted to drugs. You have to use greater care and
> 22 caution when you deal with considering their testimony, greater
> 23 care and caution than you would an ordinary witness, because of
> 24 their addiction. And she is an admitted drug user.
> 25 That's not all, though. She's also a convicted
> 1 felon. She has a 2007 conviction for possession of cocaine, a
> 2 2008 conviction for giving false information to the police --
> 3 it may not seem like a big deal, but it tells you something
> 4 about her credibility. It tells you something about whether or
> 5 not you should believe her. She got a 2008 delivery of a
> 6 controlled substance case. Then another 2008 conviction for
> 7 giving false information to a police officer. She has a
> 8 pending theft in San Antonio, pending possession in San
> 9 Patricio County, which may be affected by her performance here.
> 10 And she said she's expecting to get 50 percent off of her
> 11 sentence for her testimony in this case, and she got the
> 12 conspiracy count dropped.
> 13 Jada Gregg Warren, you watched her testify up there.
> 14 Would you buy a car from her? Would you really trust her to
> 15 buy a car from her if she was selling her car and she made
> 16 representations to you? No. And they're using her to try to
> 17 convict Ricardo Guerrero.

D.E. 709, pp. 82-83.

The Court asked Gilmore to explain procedures related to the Court's inquiry into Warren's medical condition and to assist her with related paperwork on a single occasion on November 4, 2013. The Court explicitly advised Warren that Gilmore was not her attorney. Gilmore was not appointed to represent Warren and there is no evidence that he acted as her attorney.

Warren, and a Marshal about Warren's health.

Furthermore, Guerrero has not shown an actual conflict of interest by Gilmore. Neither has Guerrero demonstrated any adverse effect on Gilmore's representation of him. The Court finds that Guerrero's claim that counsel had a conflict of interest is without merit.

## C.    Ineffective Assistance of Trial Counsel

### 1.    *Standard for claims of ineffective assistance of counsel*

Generally, an ineffective assistance claim presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. *Id.* This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001). To show that his attorney's performance at sentencing in a noncapital case was prejudicial under *Strickland*, the movant must demonstrate that counsel's error led to an increase in the length of his imprisonment. *Glover v. United States*, 531 U.S. 198, 203 (2001); *United States v. Herrera*, 412 F.3d 577, 581 (2005).

If the movant fails to prove one prong, it is not necessary to analyze the other. *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one.");

*Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

### 2. *Standard for appointment of expert witnesses*

Guerrero argues that counsel provided ineffective assistance by failing to obtain expert witnesses to assist in his defense. The Criminal Justice Act provides for appointment of experts for persons who are indigent,

> Counsel for a person who is financially unable to obtain ... expert ... services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court ... shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1); *United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006). "District courts must grant the defendant the assistance of an independent expert under § 3006A when necessary to respond to the government's case against him, where the government's case rests heavily on a theory most competently addressed by expert testimony." *Hardin*, 437 F.3d at 468 (internal quotations omitted) (quoting from *United States v. Patterson*, 724 F.2d 1128, 1130 (5th Cir. 1984)).

"[T]he government is not required to automatically provide indigent defendants with expert assistance upon demand. An indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert." *Yokey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (citing *Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir. 1987)). Non-psychiatric experts "should be provided only if the evidence is both critical to the conviction and subject to varying expert opinion." *Id*. A defendant must "establish a reasonable probability that the requested

experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial." *Griffith v. Quarterman*, 196 Fed. App'x 237, 243 (5th Cir. July 21, 2006) (per curiam) (unpublished).

Guerrero argues that trial counsel refused to consider obtaining authorization from the district court for expert witnesses on: 1) cellular telephones, 2) drug weight and purity, 3) Guerrero's business records, 4) DNA and fingerprints, 5) video tape enhancement, and 6) the investigation of Carmen Sanchez' prosecution and sentence. He claims counsel's failure constituted ineffective assistance of counsel.

### 3. *Defense showing for uncalled witnesses*

Guerrero complains that uncalled expert witnesses and an investigator could have helped him avoid conviction for money laundering and for felon in possession of firearms, as well as mitigated his sentence.

The Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 Fed. App'x 296, 298 (5th Cir. 2008)). "Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Id*. (internal citations omitted). The same standard applies to both expert and lay witnesses. *Id*.; *see*

*also United States v. Doublin*, 54 Fed. App'x 410, *2 (per curiam) (unpublished) ("Doublin only speculates that there was an expert witness available, that such an expert would have testified favorably for Doublin, and that there was discoverable evidence demonstrating Doublin's voice was not on the tape. Such speculative claims are insufficient to establish ineffective assistance of counsel.").

### 4.   *Counsel failed to obtain a cell phone expert witness*

The government introduced more than 40 telephone conversations that were intercepted from two telephones used by Guerrero. During trial, several agents testified that warrants were obtained for two different cellphones used by Guerrero. The first warrant was obtained for one phone for the period from October 12, 2012, to January 9, 2013. The second wiretap was authorized for a period from mid-December for 60 days until the middle of February 2013. D.E. 705, p. 249, D.E. 707, p. 131. Other government witnesses testified that they obtained court approval to ping various telephones of persons under investigation, Jesus Borja-Borja, Macario Martinez, and Guerrero. *See* D.E. 705, pp. 168-69, D.E. 706, pp. 135, 142.

Guerrero argues that he needed an expert to explain the "illegal phone monitoring absent any valid warrant" and further illegal search and seizures brought about by use of illegal pinging 'tracking cellphone.'" Guerrero has not stated facts that establish that a cell phone expert would have been able to assist him. As a result, he has not shown any prejudice from his claim that counsel failed to request a cell phone expert.

### 5. *Counsel failed to obtain an expert chemist*

Guerrero's offense level was enhanced in part based upon the purity of the methamphetamine seized from some of his co-conspirators. He argues that counsel should have obtained an expert chemist to test the accuracy of the governments proof. However, Guerrero's mandatory life sentence was required by statute. As a result, the purity of the methamphetamine had no effect his sentence and Guerrero cannot demonstrate prejudice from counsel's failure to seek independent testing.

### 6. *Counsel failed to hire a CPA*

Guerrero's defense to the money laundering charge was that he was a businessman who dealt in used cars, junk, rented properties, cattle, and roosters. Defense Exhibits 4-10, 20-37 consisted of titles to various vehicles, a sales agreement for a Ford van, receipt books showing various payments, bank statement for three accounts, and a receipt and purchase agreement for the shop he rented to Rene Saldana. Guerrero testified that these documents reflected his work and income, not drug proceeds.

Other witnesses testified regarding Guerrero's purchases of cattle, horses and cars. Nearly all of the purchases were made in cash and in someone else's name, including the title to his residence on Olivo Street in Mathis and the shop he rented to Rene Saldana.

Guerrero argues that a Certified Public Accountant (CPA) would have been able to explain his business dealings to the jury. However, Guerrero does not explain how a CPA would have been able to explain the large quantities of cash other witnesses testified they turned over to Guerrero[3] and the cash that Guerrero provided others to buy cars and

---

[3] As an example, Sandro Rodriguez testified that that he conveyed "close to 500,000. That's

cattle. As a result, Guerrero cannot demonstrate prejudice from counsel's failure to ask the Court to authorize a CPA for the defense.

### 7. *Counsel provided ineffective assistance regarding the firearms charge*

The government presented no fingerprint or DNA evidence. Guerrero argues that counsel should have obtained DNA and fingerprint experts to defend against the firearms charge. Guerrero also argues that the government's surveillance logs would have shown that he did not live at the Olivo Street address at the time the search warrant was executed. He claims that counsel should have subpoenaed the surveillance logs for trial, but counsel refused to do so.

Guerrero testified that he did not live at the Olivo Street address in September 2013. He claimed he moved out nine months earlier. However, the search warrant was executed at 6 a.m. and Guerrero was found in the house wearing only underclothing. Guerrero also testified he did not know the firearms were in the house.

A number of cooperating witnesses identified Guerrero's home as the Olivo Street residence. *See e.g.* D.E. 685, pp. 22-23 (Borja identifying Government Exhibit 1 as Guerrero's home); D.E. 686, p. 23 (Frank Coronado identifying the Olivo Street House).[4]

---

what I'm thinking. . . .I was making $80 G's—80G's every month and a half, two months." D.E. 704, p. 70.

[4] Q Okay. Let me ask you this. Have you ever been to
11 Mr. Guerrero's house?
12 A Yes, I have.
13 Q Where is his house?
14 A In Mathis.
15 Q How many times have you been there?
16 A I'm not too sure. About maybe 10-15 times. . . .
22 Q All right. I'm going to put another photograph up for
23 you. This is Government's Exhibit Number 1. Do you recognize

Agents Gamboa and Saenz testified that based upon the surveillance, Guerrero appeared to be living at the Olivo house. Agent Saenz also testified that the closet in the master bedroom on Olivo Street had men's, women's and a young child's clothing in it on the date of the search warrant. D.E. 707, p. 34.

Gilmore argued that the government could have linked Guerrero to the guns if it had handled the evidence better and obtained scientific proof that Guerrero handled the weapons. Guerrero claims that if counsel had obtained a fingerprint or DNA expert, counsel could have established a negative, that Guerrero never handled the firearms. He argues that the absence of his prints means he did not possess the guns. His argument is the same argument rejected by the court in *United States v. Winbush*, 580 F.3d 503, 509 (7th Cir. 2009).[5]

---

24 this photograph?
25 A Yes.
Q What is it?
2 A That's his house.

*Id*., pp. 23-24 (Testimony Frank Coronado).

[5] [T]he district court did not abuse its discretion in denying Winbush's request for a fingerprint expert. Winbush had no plausible defense that would have rendered such an expert necessary. *The evidence against him was overwhelming, and he needed no expert to explain that the absence of fingerprints on the physical evidence could mean that he never touched that evidence.* Not only is such a conclusion obvious, but Winbush could easily have elicited this information during Reilly's cross-examination. Indeed, Winbush's counsel asked Reilly about each piece of evidence and whether Reilly thought the absence of fingerprints was unusual.. . . Although the presence of fingerprints is often central to a defendant's conviction, in this case Reilly's testimony explained the absence of fingerprints. This testimony was meant to overcome a fact favorable to Winbush and was in no way the crux of the government's case—a case that rested heavily on overwhelming evidence of Winbush's guilt, including testimony from multiple eyewitnesses and a glut of physical evidence found at the scene of Winbush's attempt to flee from police.

Guerrero has not met his heavy burden to establish that a fingerprint or DNA expert or surveillance logs would have made any difference in the outcome in light of the substantial evidence that Guerrero lived in the house and his clothing was in the closet where some of the firearms were found.

**8.** *Counsel failed to obtain fingerprint evidence regarding drug packaging*

Guerrero also argues that counsel should have had a fingerprint expert examine drug packaging materials. Guerrero claims that Wayne Dedow testified Guerrero repackaged drugs. A review of Dedow's testimony reveals that Dedow did not say that, instead he testified that the drugs Guerrero passed to him were wrapped in duct tape. The facts Guerrero alleges to support this argument do not support his claim of ineffective assistance on this ground.

**9.** *Counsel failed to obtain a video expert*

The Probation Department included an increase in Guerrero's offense level for obstruction of justice based upon Doug Massey's testimony that Guerrero made a throat slashing motion at him while they were both incarcerated. Guerrero argues that he did not make such a motion and video from the facility would have negated Massey's testimony. According to Guerrero, counsel told Guerrero that the video was too grainy to enhance. Guerrero argues that counsel should have requested appointment of a video expert to attempt to enhance the tape. The government did not use the video footage at trial, but relied on Massey's testimony. As with Guerrero's other arguments related to calculation

---

*Id.* (emphasis added).

of his offense level, Guerrero cannot show prejudice. His life sentence was statutorily mandated.

## 10. *Counsel failed to fully investigate Carmen Sanchez' prosecution*

Carmen Sanchez was arrested in 2011 with methamphetamine and cocaine at the Laredo border crossing. She testified against Guerrero at trial. Guerrero argues that counsel should have obtained permission from the Court to hire an investigator to talk to witnesses regarding her arrest. He also argues that he needed a cell phone expert to examine her cell phone.

Sanchez testified at trial that she was 17 when she started working for Guerrero. She was arrested on August 20, 2011. She had two kilograms of cocaine and methamphetamine strapped to her body around her waist. D.E. 690, p. 5. She testified she was taking the drugs to Houston for Guerrero and Rodolfo Caceres. There were two men with her who also had two bundles each strapped to their bodies, but she did not recall their names. *Id*. Sanchez knew Casarez because he was friends with her father who was also in the drug trade. *Id*. Her father was killed by one of the cartels in 2010. *Id*., p. 29.

Sanchez began working with Guerrero shortly after she met him and had crossed drugs from Mexico into the United States approximately 15 times before she was arrested. Once she got through the international border, she usually took a bus to Robstown, Texas. During the bus ride, she went through a Border Patrol Checkpoint each time. Sanchez testified that she called Guerrero once she arrived in Robstown. Guerrero or his wife Elena Barrera would meet her in Robstown. One of them would drive her to

their home in Mathis, Texas, accept the drugs, and pay her. Sanchez often spent the night in a hotel and returned to the Rio Grande Valley the following day. *Id*., pp. 17-21.

Sanchez was prosecuted for possession with intent to distribute methamphetamine and was sentenced to 70 months imprisonment after credit for acceptance of responsibility, minor or mitigating role, and safety valve. *Id*., pp. 25-26. She hoped to obtain a further reduction in her sentence from testifying against Guerrero.

The case agent, Barry Carson Tufts, Jr., testified that when Sanchez debriefed, she only mentioned Caceres, not Guerrero. Sanchez did not discuss Guerrero's involvement until months after her sentencing and shortly before Guerrero's trial. *Id*., pp. 206-08. Tufts also testified that no information was obtained from Sanchez' cell phone, even after the phone was sent to the FBI laboratory.

The burden is on the defendant "[t]o justify the authorization of investigative services under § 3006A(e)(1), a defendant must demonstrate with *specificity*, the reasons why such services are required." *United States v. Gadison*, 8 F.3d 186, 191 (5th Cir. 1993) (emphasis in original); *United States v. Rodriguez-Perez,* 428 Fed. App'x 324, 327 (5th Cir. June 9, 2011) (per curiam) (unpublished).

Guerrero argues that an investigator would have been able to learn the specific details of Sanchez' deal with the government, her debriefing, and the identification of all property seized from the vehicle. Guerrero also argues that if defense counsel had examined Sanchez' cell phone, it would have reflected no calls between Guerrero and Sanchez during the days before her arrest in August 2011.

"[A] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)); *accord Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2013).

Witnesses in addition to Sanchez testified that Guerrero was involved in the distribution of methamphetamine and cocaine. Even if Guerrero could have cast doubt on Sanchez' testimony, he does not explain how it would have made any difference in his sentence. Although Guerrero argued that his offense level was enhanced because Sanchez was a minor, his life sentence was mandated by statute. Sanchez' minority made no difference.

### 11.  *Counsel failed to protect Confrontation Clause rights*

As part of his complaints regarding Sanchez' prosecution, Guerrero includes a claim that his right to confrontation was violated by Agent Tufts. Guerrero argues that he was denied the opportunity to confront Sanchez' co-defendants. However, Sanchez' co-defendants did not testify, nor did Sanchez or Tufts repeat their testimony. The agent testified that the two co-defendants were prosecuted and the agent recovered the drugs from that prosecution. The facts do not support Guerrero's claim that counsel provided ineffective assistance by failing to protect Guerrero's right to confront the witnesses against him.

**12.** *Counsel failed to challenge the interception of Molly Dimas' cell phone*

Guerrero alleges that agents illegally tapped Molly Dimas' phone. Amalia (Molly) Dimas was a co-defendant who was convicted of possession with intent to distribute heroin. The night she was arrested she spoke to Guerrero several times. The transcript of the conversations between Dimas and Guerrero showed the target phone as 549-9227, which Agent Gamboa testified was incorrect. He further testified that the target phone was Guerrero's 361 phone. There were telephone intercepts from Guerrero's 361 phone on that date. The agents explained that there was an error in the transcript of the telephone conversation. Guerrero's allegation that counsel needed a cell phone expert to challenge the intercept is unsupported by the facts and is without merit.

**D.      Ineffective Assistance Appellate Counsel**

Guerrero argues that appellate counsel provided ineffective assistance. Counsel refused to help Guerrero investigate issues for post-conviction motion. Although a criminal defendant's "entitlement to effective assistance does not end when the sentence is imposed, [and] extends to [his] first appeal of right," entitlement to appointed counsel does not extend to post-conviction matters. *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999) (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998)). Counsel properly advised Guerrero that his appointment was limited to Guerrero's appeal to the Fifth Circuit.

## IV.      CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."

28 U.S.C. § 2253(c)(1)(A). Although Guerrero has not yet filed a notice of appeal, the § 2255 Rules instruct this Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, § 2255 Rules.

A COA "may issue. . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This standard requires a § 2255 movant to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. *United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon *Slack*, 529 U.S. at 483-84).

As to claims that the district court rejects solely on procedural grounds, the movant must show both that "jurists of reasons would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).

Based on the above standards, the Court concludes that Guerrero is not entitled to a COA on any of his claims. Reasonable jurists could not debate the Court's resolution of

his claims, nor do these issues deserve encouragement to proceed. *See Jones*, 287 F.3d at 329.

## V.  CONCLUSION

For the foregoing reasons, Guerrero's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 (D.E. 925) is DENIED. He is also denied a Certificate of Appealability.

ORDERED this 3rd day of August, 2017.

_____
HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE